BRANDON BAUM (SBN: 121318)
brandon@dhillonlaw.com
KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiffs
Direct List LLC and Eran Salu

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIRECT LIST LLC, a North Carolina Limited Liability Company; and ERAN SALU, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>VISTAGE INTERNATIONAL, INC., a Delaware Corporation; PHIL KESSLER; LAUREN KESSLER; DIANA OWENS; EDETTE HERRON; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case Number: '15CV2025 WQHJLB<br><br>**COMPLAINT**<br>1. **Fraud**<br>2. **Breach of Fiduciary Duty**<br>3. **Misappropriation of Trade Secrets, Cal. Civil Code §3426 *et seq.***<br>4. **Unfair Business Practices, Cal. Bus. & Prof. Code §§ 17200 *et seq.***<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This lawsuit concerns an egregious breach of trust and confidentiality by Vistage International, Inc. and its authorized agent and Vistage CEO Group Chair, Phil Kessler (the "Vistage Defendants"), to profit from the confidential information shared by one of its CEO Group members, Plaintiff Eran Salu.

2. The Vistage Defendants hold themselves out as providing a



1

COMPLAINT

1  confidential, trusted forum in which CEOs may safely discuss their most sensitive
2  and private business affairs with fellow CEOs, led and overseen by the CEO Group
3  Chair.

4     3.    Because CEOs are reluctant to share confidential business issues with
5  others, Vistage International, Inc. provides all prospective and actual members with
6  repeated assurances that the information that members share in the Vistage setting
7  will be treated with the utmost care and confidentiality.

8     4.    According to the Vistage website, the very first "Vistage Core Value"
9  is Trust, which requires that Vistage Chairs "honor confidentiality."

10    5.    The Vistage website further explains that, "Vistage groups meet once a
11  month to solve problems, evaluate opportunities and work on an assortment of
12  strategic and operational issues. ***They are confidential forums*** of experienced
13  executives who rely on each other for wisdom and counsel."

14    6.    The Vistage press release dated June 16, 2011, announcing Mr.
15  Kessler's new Chief Executive Group in San Diego represented as follows:

## Phil Kessler Launches New Vistage Group in the San Diego Market

June 16, 2011    Share this        

**San Diego, June 16, 2011**  Vistage Chair Phil Kessler has recently launched a new Chief Executive group in San Diego. ==Kesslers new Vistage group will meet monthly to discuss business issues, share expertise, and provide one another confidential help in critical situations.==  Kessler is one of nearly 400 Vistage Chairs who lead local area groups, which total more than 15,000 members in 15 countries.



2

COMPLAINT

7. In reliance on these and many other repeated assurances of confidentiality, Mr. Salu shared confidential information with Mr. Kessler, his Vistage CEO Group Chair, regarding the design and operation of a business that Mr. Salu created called Direct List LLC. Mr. Salu only shared this information because of the assurances from the Vistage Defendants that the information would be held in strictest confidence.

8. In violation of those assurances, the Vistage Defendants, led by CEO Group Chair Phil Kessler, used Mr. Salu's confidential information to form a competing business, AVS Leads. Defendant Kessler even had the temerity to insert both of his daughters into the business – one, as its head, and the other, as its registered agent for service of process. Led by Phil Kessler and others, AVS Leads recruited away all of Direct List's key employees, and poached its customers, using confidential information of Direct List.

9. When Mr. Salu became aware of this theft of his confidential information, he promptly contacted Vistage International, Inc., only to be told that it was not their problem or concern. When Mr. Salu attempted to contact Vistage International, Inc.'s senior corporate management and counsel, they initially refused to respond, and then eventually ratified Mr. Kessler's actions.

10. On June 17, 2015, Mr. Kessler confirmed to other members of his CEO Group that senior management and legal "council" (sic) of Vistage International was "fine" with his actions. In the ratification email he sent to the group, he wrote:

> Hi All,
> Below is the link to the RevCult questionnaire so you can share it with your organization.
>
> I spoke with Vistage, their senior VP and their legal council about the situation I disclosed today and they are fine. They said they will let me know if they hear anything else and asked me to share with them if I hear more.
> It's all good.
>
> See you next month.
>
> Phil Kessler
> Chair
>
> 858-756-7676 (direct)
> phil.kessler@vistage.com
>
> VISTAGE
> better leaders · decisions · results



11. Plaintiffs now bring causes of action for fraud, breach of fiduciary duty, misappropriation of trade secrets (Cal. Civ. Code §3426 *et seq.*) and unfair business practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*), and seek to be made whole for the damages directly caused to them by virtue of Defendants' wrongdoing.

## THE PARTIES

12. Plaintiff Direct List LLC ("Direct List") is a North Carolina Limited Liability Company. Its sole owner / member is JAL Equity Corporation, which is a Nevada corporation with a principal place of business in Sarasota County, Florida.

13. Plaintiff Eran Salu ("Mr. Salu") is an individual who resides, and intends to remain, in Sarasota County, Florida.

14. Upon information and belief, Defendant Vistage International, Inc. ("Vistage") is a Delaware corporation with its principal place of business in San Diego, California. Vistage is registered to do business in California.

15. Upon information and belief, Defendant Phil Kessler ("Mr. Kessler") is an individual who, at all times relevant to the Complaint, resided in San Diego County, California.

16. Upon information and belief, Defendant Lauren Kessler ("Ms. Kessler") is an individual who, at all times relevant to the Complaint, resided within this judicial district.

17. Upon information and belief, Defendant Diana Owens ("Ms. Owens") is an individual who, at all times relevant to the Complaint, resided within this judicial district.

18. Upon information and belief, Defendant Edette Herron ("Ms. Herron"), is an individual who, at all times relevant to the Complaint, resided within this judicial district.

19. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiffs

1  at this time, and Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs will ask leave of Court to amend this Complaint when the same shall have been ascertained. Plaintiffs are informed and believe, and on that basis allege, that each DOE defendant was responsible intentionally, or in some other actionable manner, for the events and happenings referred to herein, which proximately caused injury and damage to Plaintiffs, as hereinafter alleged. Any reference to Defendants shall refer to each named Defendant and all DOE Defendants, and to each of them.

## JURISDICTION AND VENUE

20. This Court has diversity jurisdiction over the claims alleged herein, pursuant to 28 U.S.C. §1332(a), as there is complete diversity among all Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000.

21. This Court has personal jurisdiction over all Defendants because, upon information and belief, each Defendant is either a citizen of California, has sufficient minimum contacts in California, is authorized to do business and has conducted business in California, and/or otherwise intentionally avails itself /himself/herself of the California market so as to render the exercise of jurisdiction over it/him/her by the California courts consistent with traditional notions of fair play and substantial justice.

22. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because, *inter alia,* a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and one or more of the named Defendants resides and/or transacts business in San Diego County, California.

## FACTUAL ALLEGATIONS

### Mr. Salu's Relationship with Vistage International

23. Plaintiff Direct List LLC ("Direct List") is a direct marketing company with over 30 years of experience in lead generation, email marketing, direct mail, and data processing within the B2B Marketing, B2C Marketing, Real Estate Marketing, and High School Reunions industries.



COMPLAINT

24.     Vistage International Inc. ("Vistage") is a peer-to-peer membership organization for CEOs, business owners and executives of small- to mid-size businesses. Vistage holds itself out to the public as a forum for private, confidential discussions among business leaders, led by highly experienced, well-vetted (by Vistage), "expert executive coaches" called Vistage Chairs ("Chairs"). Vistage's website states that "[s]ince 1957, Vistage has been bringing together successful CEOs, executives and business owners into private peer advisory groups guided by expert executive coaches, known as Vistage Chairs."

25.     Vistage's website states that its peer advisory, business mentoring, and corporate coaching programs are "all led by Vistage Chairs," and touts that "our coaching Chairs have been at the heart of what makes the Vistage experience so powerful for so many members."

26.     Vistage's website explains the in-depth application process involved with becoming a Chair, as well as the "rigorous on-boarding program" and "rigorous development program" required of each business coach "before they join the Vistage community." The website also states that "Vistage will provide [its Chairs] with a suite of proven tools, techniques and resources to get your peer advisory group off the ground and keep it aloft."

27.     Vistage touts "Trust" as one of its "Core Values." Vistage's website includes "insights" from Chairs about what the trust value means for them, and these insights include "establish openness and vulnerability," "be dependable," and "honor confidentiality."

28.     Vistage represents that "[Vistage groups are] purpose-built so that members can help each other to solve their most pressing business concerns through a process we call peer advisory." Vistage further represents that "[t]he role of a Vistage Chair is to ensure that every bit of their group's experience and wisdom is applied in a training meeting…[Chairs] are totally committed to the success of group members…[and] take on the role with the express purpose of helping others build



1  great businesses."

2  29. Vistage's Terms of Use stress the importance of member
3  confidentiality. Specifically, the Terms of Use state that "All members of the Vistage
4  community (including Vistage members, chairs, speakers, Vistage employees and
5  certain partners or service providers) who access any Member Site agree to abide by
6  the duties and obligations set out in Vistage's Confidentiality Pledge and Standards."

7  30. In or around January 2007, while he was living in North Carolina,
8  Plaintiff Eran Salu ("Mr. Salu") joined Vistage, and began meeting with a Vistage
9  private peer advisory group approximately one time per month for several years. Mr.
10 Salu paid $1,300 monthly for his Vistage membership.

11 31. At the time Mr. Salu joined Vistage, he was given written and verbal
12 assurances by Vistage that the peer advisory group meetings would be strictly
13 confidential, meaning that neither the Chair of the group, nor any of its members,
14 would be at liberty to disclose any discussions that took place during group meetings
15 with any third parties.

16 32. Indeed, during the group meetings, the Chair and the members routinely
17 acknowledged that they were "sworn to confidentiality" concerning what occurred
18 during the meeting. These representations of confidentiality and privacy directly
19 aligned with the assurances made on Vistage's website and in Vistage member
20 materials.

21 33. Mr. Salu relied on these privacy and confidentiality representations in
22 continuing his membership in Vistage.

23 34. In 2011, Mr. Salu moved to San Diego, California, where he remained
24 affiliated with Vistage.  After several months, Mr. Salu joined a group chaired by
25 Defendant Phil Kessler (the "Vistage Group").

26 35. At all times relevant herein, Mr. Kessler was acting as the agent of
27 Vistage International, and his actions were authorized by Vistage International, and
28 later ratified by Vistage International.

36. For the following over three years, during various Vistage Group meetings, Mr. Salu shared highly confidential and sensitive business information and trade secrets about Direct List with Mr. Kessler. This information included, but was not limited to, the inner workings of the Direct List operation; potential and actual customers of Direct List, and details about various methodologies being used to provide services to clients (collectively, the "Trade Secrets").

37. Throughout Mr. Salu's involvement with the Vistage Group, he was promised that everything he shared with his Vistage Chair would be maintained as strictly confidential.

### Mr. Salu's Confidential Discussions With the Group
### Lead to Business Between Direct List and Vistage

38. In or around 2012, during a series of confidential meetings with his Vistage Group, Mr. Salu expressed his desire to monetize the data in Direct List's possession, as well as Mr. Salu's existing relationships with magazine subscribers. Mr. Salu shared with the Group that, to accomplish this goal, he was considering offering list management, email marketing, lead generation, and direct mail services to clients.

39. Many Group members expressed interest in Mr. Salu's proposal, and Mr. Kessler in particular told Mr. Salu that he would like to use Mr. Salu's lead generation services to help grow Vistage membership. Mr. Salu understood that Mr. Kessler and Vistage International stood to benefit financially if the leads provided by Mr. Salu resulted in actual new Vistage members, since Vistage membership dues are split between them.

40. In response to Mr. Kessler's request, in or around 2012, Mr. Salu and Direct List first began providing direct marketing services to Mr. Kessler, in his role as Vistage Chair. These services included drafting direct marketing correspondence and emailing this correspondence to many potential Vistage customers, encouraging them to join Vistage.

41. Within a few months of using Direct List's services, Mr. Kessler was able to enroll a number of new Vistage members, thereby benefitting both Mr. Kessler and Vistage International.

42. Mr. Kessler informed other Vistage Chairs about his success in using Direct List's services, and within 6 months, over 30 Vistage Chairs had hired Direct List for lead generation and direct marketing services.

43. Soon thereafter, in approximately late 2012, Vistage corporate asked to meet with Mr. Salu, and the parties discussed Direct List's provision of services to Vistage. Following this meeting, Direct List began to provide direct marketing to Vistage and its Group Chairs.

44. Over the course of the next several years, Vistage and Direct List did increasing amounts of business together. As part of Direct List's services to Vistage, Direct List developed a proprietary lead source technology to locate potential customers for Vistage; drafted targeted messaging to potential Vistage customers; sent one-to-one emails to targets on behalf Vistage; and developed a Customer Relationship Management ("CRM") methodology uniquely tailored to Vistage, whereby Vistage would receive all leads directly to Vistage's email inboxes.

45. The customized emails drafted by Direct List for Vistage included, at Vistage's request, a representation that all Vistage group sessions are strictly "confidential."

46. The work for Vistage was performed by Direct List's Direct Marketing Group team, which at all times relevant to the Complaint was comprised of the following five individuals: Edette Herron, Corine Redira, Risit Ratanadiloknaphuket, Cecile Agabao, and Oscar Vaszquez.

47. At all times relevant to the Complaint, Ms. Herron was the General Manager of the Direct Marketing Group, and served as the primary representative in charge of the Vistage account.

48. In or around 2014, in the context of confidential Vistage Group



meetings, Mr. Salu told Mr. Kessler that Ms. Herron could benefit from becoming a Vistage member.  Mr. Kessler subsequently placed Ms. Herron in a different Vistage group, and Mr. Salu paid for her membership. Mr. Kessler was also aware that Ms. Herron was the main point-person for the services being performed for Vistage, and Mr. Kessler and Ms. Herron maintained a cordial business relationship.

49.  One day in or late 2013, following a Vistage Group meeting, Mr. Kessler approached Mr. Salu and asked to be paid 10% of Direct List's profits from the business it was conducting with Vistage.  Mr. Kessler justified this request by suggesting that he had been responsible for introducing Direct List's services to other Vistage Chairs.

50.  In response, Mr. Salu reminded Mr. Kessler of the stated purpose of Vistage and its Chairs – namely, to help members build their businesses through providing feedback, guidance, and other support – and replied that Mr. Kessler was not entitled to a share of Direct List's profits simply for performing his job as a Vistage Chair.

51.  Mr. Kessler conceded that he could not expect compensation from Direct List for action that he took in his role as a Vistage Chair.  Mr. Kessler made no further request to Mr. Salu for a share of Direct List's profits.

**Mr. Kessler Uses Mr. Salu's Confidential Information**
**To Form a Competing Business and Poach Direct List's Employees and Customers**

52.  In or around February 2015, Mr. Salu informed Mr. Kessler that he would be moving to Florida in 3 months, and that he could therefore no longer participate in Mr. Kessler's Vistage Group.

53.  In May 2015, Mr. Salu moved to Florida. He continued to remotely manage Direct List, which carried on its business from San Diego.

54.  In May 2015, just after Mr. Salu arrived in Florida, Ms. Herron informed Mr. Salu that she needed to take disability leave for 30 days. This



1   information surprised Mr. Salu, as Ms. Herron had not previously mentioned any
2   disability or need for leave, but he approved her request.

3   55.   On May 26, 2015, approximately two weeks after Ms. Herron gave
4   notice of her leave, Ms. Corine Redira, the second-in-charge at Direct List, gave two
5   weeks' notice of her termination of employment.

6   56.   On the same day that Ms. Redira gave notice, a third employee of Direct
7   List, Oscar Vasquez, gave notice that he was quitting effective that day.

8   57.   Stunned at the sudden loss of what had previously been three long-term
9   and reliable employees, Mr. Salu contacted the remaining two members of the Direct
10  Marketing Group team – Risit Ratanadiloknaphuket and Cecile Agabao – and asked
11  them whether they would remain with the company. On the next day, those two
12  employees resigned, leaving the Direct Marketing Group wholly gutted.

13  58.   In or around June 2015, Mr. Salu conducted Internet research and
14  discovered a competitor company called AVS Leads. Mr. Salu called AVS Leads
15  and, acting on a hunch, asked to speak with Edette Herron, the Direct List employee
16  who was supposedly out on disability leave. To Mr. Salu's surprise, he was
17  connected to Ms. Herron. Mr. Salu identified himself and tried to determine what
18  was going on. Ms. Herron responded with words to the effect of, "I can't talk to
19  you, I'm on disability, I'm not mentally well," and hung up the phone.

20  59.   After conducting additional research, Mr. Salu learned that an
21  individual by the name of Lauren Kessler was making credit applications on behalf
22  of AVS Leads. Mr. Salu further learned from Ms. Kessler's LinkedIn page that she
23  was the General Manager of AVS Leads.

24  60.   Noting the shared last name between Lauren Kessler and Phil Kessler,
25  Mr. Salu contacted two members of the Vistage Group, Mike Rodman and Ted
26  Ricassa, and asked them if they knew about any affiliation between Lauren Kessler,
27  Phil Kessler, and AVS Leads.

28  61.   Upon information and belief, following a Group meeting, Mr. Ricassa



11

COMPLAINT

1  and Mr. Rodman confronted Mr. Kessler about his apparent affiliation with Lauren Kessler and AVS Leads, and Mr. Kessler confirmed that Lauren Kessler was his daughter and that she worked for AVS Leads. Mr. Kessler further conceded that he had introduced his daughter and Ms. Herron to facilitate the formation of a business intended to directly compete with Direct List.

62.   According to the California Secretary of State website, AVS Leads was registered in California (as "AVS LLC") on May 14, 2015, and the agent for service of process for the company is an individual named Diana Owens.

63.   Upon information and belief, Diana Owens was born Diana Kessler and, like Lauren Kessler, she is Phil Kessler's daughter.

64.   Upon information and belief, the website domain for AVS Leads (www.avsleads.com) was registered on May 19, 2015.  The true name of the registrant has been concealed, using Go Daddy LLC as a proxy.

65.   On June 25, 2015, Mr. Kessler sent an email to his Vistage Group (the "Email"), in which he represented that "his daughter" had been "want[ing] to expand into lead generation." Mr. Kessler's email conceded that he had made a "major mistake" and recognized that he had breached the confidentiality obligations of a Vistage Chair.

66.   Mr. Kessler did not copy Mr. Salu on the Email sent to the rest of the Vistage Group. Mr. Salu learned of the Email when it was sent to him by another member of the Group.

67.   Upon information and belief, prior to becoming the General Manager of AVS Leads, Lauren Kessler worked with a laser hair removal company, with little or no experience in the list business or lead generation business.

68.   Upon information and belief, prior to her affiliation with AVS Leads, Diana Owens was a nurse, with no experience in the list business or lead generation business.

69.   Upon information and belief, Mr. Kessler conspired with his daughters,



12
COMPLAINT

with Ms. Herron, and with other Doe Defendants to set up a business, AVS Leads, that would directly and unfairly compete with Direct List by making use of Direct List's confidential and proprietary information and Trade Secrets, as well as by poaching all of Direct List's Direct Marketing Group employees.

70. Upon information and belief, Mr. Kessler and Doe defendants formed AVS Leads one week before Ms. Herron went on purported disability leave, while she was still an employee of Direct List.

71. Upon information and belief, AVS Leads currently employees all five of the ex-employees of Direct List's Direct Marketing Group.

72. Upon information and belief, AVS Leads has poached, and is currently doing business with, all of Direct List's former clients other than Vistage. Vistage remains Direct List's sole remaining client.

73. AVS Leads maintains a profile on LinkedIn.com, as well as a website at avsleads.com. On both of these cites, AVS Leads touts experience and qualifications that are substantially similar to those of Direct List, stating that "our team of experts have over 35 years in the list business," and further represents that its "proprietary lead source technology" is used to "deliver the most accurate Consumer, Business, and Residential lists" for lead generation.

74. Each of Mr. Salu's employees on the Direct Marketing Group team – including Ms. Herron, Ms. Agabao, Mr. Vasquez, Ms. Redira, and Mr. Ratanadiloknaphuket – signed an employment agreement with Direct List, pursuant to which they agreed not to solicit away Direct List's employees following their termination.

75. The formation and success of AVS Leads was made possible solely through the misappropriation of Direct List's confidential business materials, which was orchestrated by Mr. Kessler in reliance on confidential information he had learned from Mr. Salu in his role as Vistage Chair, acting as agent for Vistage International.

76. As a result of the conduct described above, Direct Leads has been deprived of the vast majority of its clients, and over half of its profits, estimated at this time to exceed $3 million in value.

**FIRST CAUSE OF ACTION**
**Fraud**
**(By Mr. Salu Against Vistage Defendants)**

77. Plaintiffs incorporate every allegation contained in the preceding paragraphs, as though set forth fully herein.

78. Defendants Vistage and Mr. Kessler (collectively, the "Vistage Defendants") made a promise to Mr. Salu that they would ensure the confidentiality of the business information that he shared as part of his membership in Vistage International (the "Promise").

79. The Promise was important to Mr. Salu's decision to become a member of Vistage, and to join the Vistage Group of which Mr. Kessler was a Chair.

80. The Vistage Defendants did not intend to perform the Promise when they made it.

81. The Vistage Defendants intended that Mr. Salu rely on the Promise in joining Vistage, in continuing his Vistage membership, and in sharing sensitive business information with the Group.

82. Mr. Salu reasonably relied on the Promise, which was reiterated by Vistage in its published literature and in its membership agreement, and was repeated by Mr. Kessler at Group meetings.

83. The Vistage Defendants did not uphold their Promise. Instead, they disclosed Mr. Salu's confidential business information to third parties, and used that information to launch a business that competes with Direct List.

84. When informed of Mr. Kessler's actions, Vistage International ratified those actions and informed Mr. Kessler and his Vistage Group members that what



14
COMPLAINT

1 Mr. Kessler had done was "fine."

85. As a direct result of the Vistage Defendants' conduct, as described above, Mr. Salu has suffered damages in the form of substantial loss of business and profits to his company, in the estimated amount of $3 million.

86. Mr. Salu's reliance on the Vistage Defendants' Promise was a substantial factor in causing him the harm. But for the Promises made concerning strict confidentiality of Vistage Group meetings, Mr. Salu would never had joined Vistage or shared sensitive information with his Vistage Group.

### SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty
### (By Mr. Salu Against the Vistage Defendants)

87. Plaintiffs incorporate every allegation contained in the preceding paragraphs, as though set forth fully herein.

88. The Vistage Defendants each undertook by agreement to be fiduciaries to Mr. Salu, and they established a mentor-mentee relationship that was borne out in the context of the Vistage Group meetings, as discussed above.

89. The Vistage Defendants breached their fiduciary duties of reasonable care, loyalty, and confidentiality, when they failed to maintain the confidentiality of the sensitive business information that Mr. Salu disclosed to the Group; knowingly and intentionally disclosed that information to third parties; and used that information to direct compete with Mr. Salu's company.

90. The Vistage Defendants' breach of fiduciary duty has damaged Mr. Salu. As a direct result of this breach, Mr. Salu has suffered damages in the form of substantial loss of business and profits to his company, in the estimated amount of $3 million.

### THIRD CAUSE OF ACTION
### Misappropriation of Trade Secrets
### Cal. Civil Code §3426 *et seq.*
### (By Direct List Against Mr. Kessler, Ms. Kessler, Ms. Owens, and Ms. Herron)



15

COMPLAINT

1   91.    Plaintiffs incorporate every allegation contained in the preceding
2 paragraphs, as though set forth fully herein.
3   92.    Defendants Vistage, Mr. Kessler, and Ms. Kessler, Ms. Owens, and
4 Ms. Herron acted willfully and intentionally to obtain and misappropriate Direct
5 List's confidential and proprietary information and trade secrets, as discussed in
6 detail above (collectively, the "Trade Secrets").
7   93.    Mr. Kessler, using the information he had obtained through
8 confidential Group meetings, directed Ms. Herron and other Direct List employees
9 to use their position of trust, authority and access within Direct List to obtain and
10 misappropriate Direct List's Trade Secrets using improper means, as defined in
11 Cal. Civil Code §3426.1(a).
12   94.    Mr. Kessler, Ms. Kessler, Ms. Owens, and Ms. Herron conspired to
13 use Direct List's Trade Secrets to directly compete with Direct List, including for
14 the same customers and potential customers of Direct List.
15   95.    Mr. Kessler, Ms. Kessler, Ms. Owens, and Ms. Herron have
16 committed the misconduct discussed above with the intent and desire to further
17 their own interests, to use and profit from the Trade Secrets, and to harm Direct
18 List. Mr. Kessler and are profiting from the misappropriation of the Trade Secrets.
19   96.    The Trade Secrets derive independent economic value from not being
20 generally known to the public or to Direct List's competitors, including but not
21 limited to, AVS Leads. Mr. Kessler, Ms. Kessler, Ms. Owens, and Ms. Herron
22 have used this information to grow their business, without having to invest the
23 substantial time and money that Direct Leads spent.
24   97.    Upon information and belief, at all relevant times, Mr. Kessler, Ms.
25 Kessler, Ms. Owens, and Ms. Herron knew or had reason to know that the Trade
26 Secrets constituted Direct Leads' trade secrets. Direct Leads took sufficient care to
27 maintain the confidentiality of this information by, *inter alia,* obtaining written
28 assurances from employees that they would keep the Trade Secrets confidential,



16
COMPLAINT

storing the Trade Secrets in a safe place and limiting access to same, having employees sign confidentiality agreements, and sharing information with employees on a need-to-know basis.

98. Direct List has been damaged as a result of Mr. Kessler, Ms. Kessler, Ms. Owens, and Ms. Herron's actions, for which Direct List is entitled to damages, the nature and extent of which will be proved at trial.

99. The acts described above, were and continue to be willful, oppressive, fraudulent, and malicious, warranting an award of punitive damages in addition to the actual damages suffered by Direct List.

### FOURTH CAUSE OF ACTION
### Unfair Competition, Bus. & Prof. Code §§ 17200 *et seq.*
### (Against All Defendants)

100. Plaintiffs incorporate every allegation contained in the preceding paragraphs, as though set forth fully herein.

101. The acts of Defendants alleged herein, including but not limited to conspiracy, misappropriation, fraud, breach of fiduciary duty, constitute unlawful, unfair, and fraudulent business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

102. By reason of the foregoing acts, Defendants have caused, and continue to cause, substantial and irreparable damage and injury to Plaintiffs. Defendants have benefited from such unlawful conduct, and will continue to carry out such unlawful conduct and to be unjustly enriched thereby, unless enjoined by this Court.

103. As a proximate and direct result of Defendants' acts as alleged herein, Plaintiffs have sustained damages in an amount to be proven at trial.

104. As a consequence of Defendants' actions, Plaintiffs are also entitled to injunctive relief and an order that Defendants disgorge all of their profits obtained from the services offered in connection with the operation of a business that uses Direct Lists' Trade Secrets to directly compete with Direct List.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For compensatory damages according to proof, in an amount believed to be in excess of $3,000,000;

2. For punitive and exemplary damages according to proof;

3. For pre and post-judgment interest, as allowed by law;

4. For a preliminary and permanent injunction, enjoining and prohibiting all Defendants and any of their officers, directors, employees, agents, subsidiaries, distributors, dealers, and all persons in active concert or participation with any of them, from making use of any Direct List Trade Secrets;

5. For an Order requiring Defendants to account for and disgorge all gains, profits and advantages from the violations of statute and common law;

6. For recovery of costs and fees, as allowed by law; and

7. For such other and further relief as the Court may deem proper.

Date: September 11, 2015          DHILLON LAW GROUP INC.

By: _____
Brandon Baum
Krista L. Baughman
Attorneys for Plaintiffs
Direct List LLC and Eran Salu

## DEMAND FOR JURY TRIAL

Plaintiff demands trial of all issues by jury.

Date: September 11, 2015          DHILLON LAW GROUP INC.

By: _____
Brandon Baum
Krista L. Baughman
Attorneys for Plaintiffs
Direct List LLC and Eran Salu



COMPLAINT