# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIRECT LIST LLC, a North Carolina Limited Liability Company; and ERAN SALU, an individual,<br><br>Plaintiff,<br><br>v.<br><br>VISTAGE INTERNATIONAL, INC., a Delaware Corporation; PHIL KESSLER; LAUREN KESSLER; DIANA OWENS; EDETTE HERRON; and DOES 1 through 10, inclusive,<br><br>Defendant. | CASE NO. 15cv2025-WQH-JLB<br><br>ORDER |

HAYES, Judge:

The matter before the court is the Motion to Dismiss Pursuant to Fed. R. Civ. Proc. 12(B)(6) filed by Defendant Vistage International, Inc.[1] (ECF No. 11).

**I. Background**

On September 11, 2015, Plaintiffs Direct List LLC and Eran Salu ("Plaintiffs") commenced this action by filing the Complaint alleging four causes of action: (1) fraud, (2) breach of fiduciary duty, (3) misappropriation of trade secrets in violation of California Civil Code § 3426 *et seq.*, and (4) unfair business practices in violation of California Business and Professions Code § 17200 *et seq.* (ECF No. 1). On October

---

[1] In the Motion to Dismiss, Defendant states that its name is VISTAGE WORLDWIDE, INC and that it was "erroneously sued as VISTAGE INTERNATIONAL, INC." (ECF No. 11-1 at 1).

27, 2015, Defendant Vistage International ("Vistage") filed a motion to dismiss Plaintiffs' first and second causes of action—fraud and breach of fiduciary duty—pursuant to Federal Rule of Civil Procedure 12(b)(6) with prejudice for failure to state a claim upon which relief can be granted. (ECF No. 11). On November 16, 2015, Plaintiffs filed a response in opposition. (ECF No. 12). On November 23, 2015, Vistage filed a reply. (ECF No. 14).

**II. Allegations of the Complaint**

Vistage is an organization that offers chief executive officers (CEOs) a "confidential, trusted forum in which CEOs may safely discuss their most sensitive and private business affairs with fellow CEOs, led and overseen by the CEO Group Chair." (ECF No. 1 at ¶2). "Vistage International, Inc. provides all prospective and actual members with repeated assurances that the information that members share in the Vistage setting will be treated with the utmost care and confidentiality." *Id*. at ¶ 3. "According to the Vistage website, the very first 'Vistage Core Value' is Trust, which requires that Vistage Chairs 'honor confidentially.'" *Id*. at ¶ 4. The website further explains that the groups, which meet once a month, are "confidential forums." *Id*. at ¶ 5.

Vistage provides its services through Vistage Chairs, who are "highly experience, well-vetted (by Vistage), 'expert executive coaches' . . . ." *Id*. at ¶ 24. "Vistage's website states that its peer advisory, business mentoring, and corporate coaching programs are 'all led by Vistage Chairs,' and touts that 'our coaching Chairs have been at the heart of what makes the Vistage experience so powerful for so many members.'" *Id*. at ¶ 25. "Vistage's website explains the in-depth application process involved with becoming a Chair, as well as the 'rigorous on-boarding program' and 'rigorous development program' required of each business coach 'before they join the Vistage community.'" *Id*. at ¶ 26. " The website also states that 'Vistage will provide [its Chairs] with a suite of proven tools, techniques and resources to get your peer advisory group off the ground and keep it aloft.'" *Id*. Vistage "represents that '[t]he role of a

1 Vistage Chair is to ensure that every bit of their group's experience and wisdom is
2 applied in a training meeting . . . [Chairs] are totally committed to the success of group
3 members . . . [and] take on the role with the express purpose of helping others build
4 great businesses.'" *Id*. at ¶ 28.  Vistage's Terms of Use state, "All members of the
5 Vistage community (including Vistage members, chairs, speakers, Vistage employees
6 and certain partners or service providers) who access any Member Site agree to abide
7 by the duties and obligations set out in Vistage's Confidentiality Pledge and Standards."
8 *Id*. at ¶ 29.

9      "Plaintiff Direct List LLC ("Direct List") is a direct marketing company with
10 over 30 years of experience in lead generation, email marketing, direct mail, and data
11 processing within the B2B Marketing, B2C Marketing, Real Estate Marketing, and
12 High School Reunions industries." *Id*. at ¶ 23.  Plaintiff Eran Salu ("Salu") created
13 Direct List LLC.  *Id*. at ¶ 7.

14      In or around 2007, Salu joined Vistage and paid "$1,300 monthly for his Vistage
15 membership." *Id*. at ¶ 30.  " At the time Mr. Salu joined Vistage, he was given written
16 and verbal assurances by Vistage that the peer advisory group meetings would be
17 strictly confidential, meaning that neither the Chair of the group, nor any of its
18 members, would be at liberty to disclose any discussions that took place during group
19 meetings with any third parties." *Id*. at ¶ 31.  "Indeed, during the group meetings, the
20 Chair and the members routinely acknowledged that they were 'sworn to
21 confidentiality' concerning what occurred during the meeting." *Id*. at ¶ 32.  "These
22 representations of confidentiality and privacy directly aligned with the assurances on
23 Vistage's website and in Vistage member materials." *Id*.

24      In 2011, Salu moved to San Diego, California, and "joined a [Vistage] group
25 chaired by Defendant Phil Kessler . . . ." *Id*. at ¶ 34.  "At all times relevant herein, Mr.
26 Kessler was acting as the agent of Vistage International, and his actions were authorized
27 by Vistage International, and later ratified by Vistage International." *Id*. at ¶ 35.

28      "For the following . . . three years, during various Vistage Group meetings, Mr.

Salu shared highly confidential and sensitive business information and trade secrets about Direct List with Mr. Kessler. This information included, but was not limited to, the inner workings of the Direct List operation; potential and actual customers of Direct List, and details about various methodologies being used to provide services to clients . . . ." *Id.* at ¶ 36. "Throughout Mr. Salu's involvement with the Vistage Group, he was promised that everything he shared with his Vistage Chair would be maintained as strictly confidential." *Id.* at ¶ 37.

In or around 2012, Salu "began providing direct marketing services to Mr. Kessler, in his role as Vistage Chair." *Id.* at ¶ 40. "These services included drafting direct marketing correspondence and emailing this correspondence to many potential Vistage customers, encouraging them to join Vistage." *Id.* "The customized emails drafted by Direct List for Vistage included, at Vistage's request, a representation that all Vistage group sessions are strictly 'confidential.'" *Id.* at ¶ 45. "Mr. Salu understood that Mr. Kessler and Vistage International stood to benefit financially if the leads provided by Mr. Salu resulted in actual new Vistage members, since Vistage membership dues are split between them." *Id.* at ¶ 39.

"Within a few months of using Direct List's services, Mr. Kessler was able to enroll a number of new Vistage members, thereby benefitting both Mr. Kessler and Vistage International." *Id.* at ¶ 41. "Mr. Kessler informed other Vistage Chairs about his success in using Direct List's services, and within 6 months, over 30 Vistage Chairs had hired Direct List for lead generation and direct marketing services." *Id.* at ¶ 42. "Soon thereafter, in approximately late 2012, Vistage corporate asked to meet with Mr. Salu, and the parties discussed Direct List's provision of services to Vistage." *Id.* at ¶ 43. "Following this meeting, Direct List began to provide direct marketing to Vistage and its Group Chairs." *Id.* "The work for Vistage was performed by Direct List's Direct Marketing Group team, which at all times relevant to the Complaint was comprised of the following five individuals: Edette Herron, Corine Redira, Risit Ratanadiloknaphuket, Cecile Agabao, and Oscar Vaszquez." *Id.* at ¶ 46.

1
2
3
4
5
6
7
8
9
10

"One day in or late 2013, following a Vistage Group meeting, Mr. Kessler approached Mr. Salu and asked to be paid 10% of Direct List's profits from the business it was conducting with Vistage. Mr. Kessler justified this request by suggesting that he had been responsible for introducing Direct List's services to other Vistage Chairs." *Id.* at ¶ 49.  "In response, Mr. Salu reminded Mr. Kessler of the stated purpose of Vistage and its Chairs – namely, to help members build their businesses through providing feedback, guidance, and other support – and replied that Mr. Kessler was not entitled to a share of Direct List's profits simply for performing his job as a Vistage Chair." *Id.* at ¶ 50.  "Mr. Kessler conceded that he could not expect compensation from Direct List for action that he took in his role as a Vistage Chair." *Id.* at ¶ 51.

11
12
13
14
15

In or around 2014, "Salu told Mr. Kessler that Ms. Herron could benefit from becoming a Vistage member." *Id.* at ¶ 48.  "Mr. Kessler subsequently placed Ms. Herron in a different Vistage group, and Mr. Salu paid for her membership." *Id.* "Mr. Kessler was also aware that Ms. Herron was the main point-person for the services being performed for Vistage . . . ." *Id.* at ¶ 48.

16
17
18
19
20
21
22
23
24
25

"In or around February 2015, Mr. Salu informed Mr. Kessler that he would be moving to Florida in 3 months, and that he could therefore no longer participate in Mr. Kessler's Vistage Group." *Id.* at ¶ 52.  In May 2015, shortly after Salu moved to Florida, "Ms. Herron informed Mr. Salu that she needed to take disability leave for 30 days." *Id.* at ¶ 54.  Approximately two weeks later, all of Salu's employees quit. *Id.* at ¶¶ 55, 56.  Salu then discovered a "competitor company called AVS Leads." *Id.* at ¶ 58.  Salu learned that Herron worked at AVS Leads and that Kessler's daughter was the general manager. *Id.* at ¶¶ 58, 59.  Kessler "conceded that he had introduced his daughter and Ms. Herron to facilitate the formation of a business intended to directly compete with Direct List." *Id.* at ¶ 61.

26
27
28

"On June 17, 2015, Mr. Kessler confirmed to other members of his CEO Group that senior management and legal 'council' (sic) of Vistage International was 'fine' with his actions." *Id.* at ¶ 10.  "On June 25, 2015, Mr. Kessler sent an email to his Vistage

Group . . . in which he represented that 'his daughter' had been 'want[ing] to expand into lead generation.'" *Id*. at ¶ 65. "Mr. Kessler's email conceded that he had made a 'major mistake' and recognized that he had breached the confidentiality obligations of a Vistage Chair." *Id*.

"Mr. Kessler conspired with his daughters, with Ms. Herron, and with other Doe Defendants to set up a business, AVS Leads, that would directly and unfairly compete with Direct List by making use of Direct List's confidential and proprietary information and Trade Secrets, as well as by poaching all of Direct List's Direct Marketing Group employees." *Id*. at ¶ 69.

"The formation and success of AVS Leads was made possible solely through the misappropriation of Direct List's confidential business materials, which was orchestrated by Mr. Kessler in reliance on confidential information he had learned from Mr. Salu in his role as Vistage Chair, acting as agent for Vistage International." *Id*. at ¶ 75. "When Mr. Salu became aware of this theft of his confidential information, he promptly contacted Vistage International, Inc., only to be told that it was not their problem or concern." *Id*. at ¶ 9. "When Mr. Salu attempted to contact Vistage International, Inc.'s senior corporate management and counsel, they initially refused to respond, and then eventually ratified Mr. Kessler's actions." *Id*.

Plaintiffs allege the following causes of action: (1) fraud against Vistage and Kessler; (2) breach of fiduciary duty against Vistage and Kessler; (3) misappropriation of trade secrets in violation of California Civil Code section 3426 *et seq*. against Kessler, Ms. Kessler, Owens, and Herron; and (4) unfair competition in violation of Business and Professions Code section 17200 *et seq*. against all Defendants.

**III. Discussion**

    **A. Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To sufficiently state a claim for relief and survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

**B. Fraud Claim**

Vistage contends that Plaintiffs' fraud claim should be dismissed because it is not plead with the requisite specificity required by Federal Rule of Civil Procedure 9(b). Vistage contends that Plaintiff failed to adequately plead "two critical components for a fraud claim: knowledge of falsity (scienter) and Vistage's intent to defraud him with these representations." (ECF No. 14 at 2). Vistage contends that Plaintiffs' "agency allegations fail for lack of specificity, as Plaintiffs plead no allegations, other than overboard conclusory allegations, sufficient to show that Vistage directed or participated in the wrongful conduct." (ECF No. 11-1 at 5). Defendant also contends that Plaintiff's agency allegations fail because Kessler was an "independent contractor."

1 *Id*. at 1, 2, 7.

2       Plaintiffs contend that the fraud claim against Vistage is pled with the requisite specificity because the Complaint is "very specific regarding the fraudulent misrepresentations made by Vistage" and the Complaint "alleges that Vistage is liable for the actions attributable to Phil Kessler under the legal doctrines of agency and ratification." *Id*. at 4, 10.

      Under California law, the elements of a claim for fraud are: "(1) a misrepresentation, which includes a concealment or nondisclosure; (2) knowledge of the falsity of the misrepresentation, i.e., scienter; (3) intent to induce reliance on the misrepresentation; (4) justifiable reliance; and (5) resulting damages." *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004) (citing *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173 (2003)). Claims sounding in fraud or mistake must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that a complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quotation omitted); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (averments of fraud must be accompanied by "the who, what, when, where, and how of the misconduct charged") (quotation omitted).

      In a suit involving multiple defendants, "there is no absolute requirement that . . . the complaint must identify *false statements* made by each and every defendant." *Swartz*, 476 F.3d at 764 (emphasis in original). "On the other hand, Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Id.* at 764-65 (citation, internal quotations, and alterations omitted). "[A] plaintiff must, at a minimum, identify the role of each defendant in the alleged

1 fraudulent scheme." *Id.* at 765 (citation, internal quotations, and alterations omitted**)**.

2 "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). For example, "a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority." *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982). "Under an apparent authority theory, liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *Id.* (internal quotation marks omitted).

Under California law, ratification may create an agency relationship where one did not exists. Cal. Civ. Code § 2307 ("An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification."). A principal may become liable for an act not originally authorized, if the principal ratifies that act. *Shultz Steel Co. v. Hartford Accident & Indem. Co.*, 231 Cal. Rptr. 715, 720 (Ct. App. 1986).

Plaintiffs allege that Vistage had an "in-depth application process involved with becoming a Chair" as well as a "rigorous on-boarding program" and a "rigorous development program" for its Chairs. *See* ECF No. 1 at ¶ 26. Plaintiffs allege that Vistage advertised that it provided its Chairs with "tools, techniques and resources to get your peer advisory group off the ground and keep it aloft." *See id*. Plaintiffs allege that at all relevant times, "Kessler was acting as the agent of Vistage International, and his actions were authorized by Vistage International, and later ratified by Vistage International." *Id.* at ¶ 35. Plaintiffs allege that Kessler confirmed to other members of the CEO Group that Vistage senior management and legal counsel were "fine" with Kessler's actions. *See id.* at ¶ 10. The allegations of the Complaint are adequate to infer that Vistage may be liable for the actions of Kessler under the theory of agency

and ratification. Vistage's claim that Kessler was an "independent contractor," *see e.g.*, ECF No. 12 at 2, is a factual matter not resolved at the pleading stage.

Plaintiffs' Complaint includes several allegations detailing the time, place, and content of representations made by Vistage and Kessler to Plaintiffs. Plaintiffs allege that Vistage advertised on its website that confidentiality was a "Core Value" and that Vistage Chairs "honor confidentiality." (ECF No. 1 at ¶¶ 4, 27). Plaintiffs also allege that at the time Salu joined Vistage "he was given written and verbal assurances by Vistage that the peer advisory group meeting would be strictly confidential . . . ." *Id*. at ¶ 31. Plaintiffs allege that they justifiably relied on those promises of confidentiality when joining Vistage and sharing confidential information at the meetings. *Id*. at ¶ 33. Plaintiffs allege, generally, that Kessler knew that the representations of confidentiality were false and that Kessler intended to induce Plaintiffs reliance with the intent to defraud and deceive Plaintiffs. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553-54 (9th Cir. 2007) ("While the factual circumstances of the fraud must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged generally."). Plaintiffs allege that Ms. Herron joined Vistage and that Kessler placed her "in a different Vistage group" than the one that Saru was in. *Id*. at ¶ 48. Plaintiffs allege that Kessler "conceded that he had introduced his daughter and Ms. Herron to facilitate the formation of a business intended to directly compete with Direct List." *Id*. at ¶ 61. Plaintiffs allege that Mr. Kessler sent an email in which he "conceded that he had made a 'major mistake' and recognized that he had breached the confidentiality obligations of Vistage Chair." *Id*. at ¶ 65. Plaintiffs allege that "Kessler conspired with his daughters . . . [and] Ms. Herron . . . to set up a business, AVS Leads, that would directly and unfairly compete with Direct List by making use of Direct List's confidential and proprietary information and trade Secrets . . . ." *Id* at ¶ 69. The Court concludes that the allegations of the Complaint are sufficient to show that Kessler may be liable for fraud and that Vistage may be liable for Kessler's actions.

**C. Fiduciary Duty Claim**

Vistage contends that it does not owe Salu a fiduciary duty. (ECF No. 11-1 at 6). Vistage contends that, "[a]t best, Salu claims that Vistage breached a promise to Salu to provide confidentiality." *Id.* Vistage contends that,

> Vistage had no personal relationship with Salu that created a relationship of trust and confidence that placed Vistage in a superior relationship. And, Vistage did not create a fiduciary duty between it and Salu just because it contracted with Salu to add him to Round Table Meetings chaired by Phil [Kessler], an independent contractor.

*Id.* at 6-7.

Plaintiffs contend that the Complaint alleges a fiduciary duty because it alleges that "Vistage held out itself and its Chairs as providing confidential business services and voluntarily accepted the trust and confidence of Salu." (ECF No. 12 at 15). Plaintiffs contend that the Complaint alleges that Kesler breached the fiduciary duty and that Vistage is liable for Kessler's actions under the legal doctrines of agency and ratification.

Under California law, the elements for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) a breach of the fiduciary duty; and (3) resulting damage. *Pellegrini v. Weiss*, 81 Cal. Rptr. 3d 387, 397 (Ct. App. 2008). There are two kinds of fiduciary duties–those imposed by law and those undertaken by agreement. *Maglica v. Maglica*, 78 Cal. Rptr. 2d 101, 103 (Ct. App. 1998). Legal relationships such as "guardian and ward, trustee and beneficiary, principal and agent, or attorney and client" are examples of fiduciary relationships imposed by law. *Barbara A. v. John G.*, 193 Cal. Rptr. 422, 431 (Ct. App. 1983).

"A fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another." *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 99 Cal. Rptr. 2d 665, 670 (Ct. App. 2000). "[A] confidential relationship arises 'where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed, . . . voluntarily accepts or assumes to accept the confidence.'" *Id.* (citing *Barbara A.* 193 Cal. Rptr. at 432).

However, the mere fact that parties "reposed trust and confidence in each other" does not establish a fiduciary relationship. *Girard v. Delta Towers Joint Venture*, 26 Cal. Rptr. 2d 102, 106 (Ct. App. 1993). "A fiduciary . . . assumes duties beyond those of mere fairness and honesty . . . he must undertake to act on behalf of the beneficiary, giving priority to the best interest of the beneficiary." *Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 676 (1983). "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Barbara A.*, 193 Cal. Rptr. at 432. "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." *Children's Television*, 673 P.2d at 675-76. "Not surprisingly, the existence of such a relationship founded upon agreement (the 'repose' and 'acceptance' of a confidence) is a question of fact." *GAB Bus. Servs.*, 99 Cal. Rptr. 2d at 670.

In this case, Vistage and Plaintiffs do not have a legal relationship that creates a fiduciary duty imposed by law; therefore, the only fiduciary duty that could have been created between Vistage and Plaintiffs would be one undertaken by agreement. *See Maglica*, 78 Cal. Rptr. 2d at 103 (describing the two types of fiduciary duties). Plaintiffs allege that Vistage advertised itself and its Chairs as providing confidential services and that Salu relied on those repeated assurances of confidentiality when joining Vistage. *See* ECF No. 1 at ¶¶ 4, 5, 7, 29, 31, 32, 33. Plaintiffs allege that "[a]t the time Mr. Salu joined Vistage, he was given written and verbal assurances by Vistage that the peer advisory group meetings would be strictly confidential . . . ." *Id.* at ¶ 30. Plaintiffs generally allege that Vistage gave Salu "written and verbal assurances" of confidentiality. *See e.g.*, *City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1049 (N.D. Cal. 2002) (Noting that "parties to a confidentiality agreement do not stand in a fiduciary relationship as to each other simply by virtue of the

1  agreement."). The Court concludes that Plaintiff has not alleged sufficient facts
2  plausibly suggestive of a fiduciary relationship between Vistage and Plaintiff. *See*
3  *Barbara A.*, 193 Cal. Rptr. at 432 ("The essence of a fiduciary or confidential
4  relationship is that the parties do not deal on equal terms because [one party] . . . is in
5  a superior position to exert unique influence over the dependent party."); *Children's*
6  *Television*, 673 P.2d at 675-76 ("To be charged with a fiduciary duty a party must
7  "knowingly undertake to act on behalf and for the benefit of another[.]"). Defendant's
8  motion to dismiss Plaintiffs' claim of breach of fiduciary duty is granted.

## IV. Conclusion

IT IS HEREBY ORDERED that Defendant's motion to dismiss is granted (ECF No. 11) in part and denied in part. Plaintiffs' claim for breach of fiduciary duty is dismissed without prejudice. Plaintiffs' claim for fraud is not dismissed.

DATED: February 8, 2016

**WILLIAM Q. HAYES**
United States District Judge